## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

THOA T. NGUYEN, ET AL.                                       CIVIL ACTION

VERSUS

LOUISIANA STATE BOARD OF                          NO.: 14-00080-BAJ-RLB
COSMETOLOGY, ET AL.

### RULING AND ORDER

Before the Court are four **Motions for Summary Judgment (Docs. 149,
151, 152, 156)** filed by Defendant Celia R. Cangelosi.  Defendant seeks summary
judgment on the claims asserted by Thoa Nguyen d/b/a Exotic Nails, Hien Hoang
d/b/a Magic Nails, Uan Pham d/b/a Elegant Nails #2, and Mai Thi Nguyen d/b/a Nu
Nails.  Plaintiffs filed memoranda in opposition to the Motions, (*see* Docs. 155, 157,
159, 166), and Defendant filed corresponding replies to those memoranda in
opposition, (*see* Docs. 163, 171, 172, 178).  The Court has jurisdiction pursuant to 28
U.S.C. §§ 1331, 1367.  Oral argument is not necessary.  For the reasons explained
herein, Defendant's **Motions for Summary Judgment (Docs. 149, 151, 152)**
pertaining to Plaintiffs **Thoa Nguyen**, **Hien Hoang**, and **Uan Pham** are
**GRANTED**, but Defendant's **Motion for Summary Judgment (Doc. 156)**
pertaining to Plaintiff **Mai Thi Nguyen** is DENIED.

## I.   BACKGROUND[1]

This action was initiated on February 6, 2014, by nine nail-salon owners of Vietnamese and Asian heritage.  The nine Plaintiffs sought injunctive relief and damages against the Louisiana State Board of Cosmetology ("LSBC") and individuals associated with the LSBC, including Celia R. Cangelosi ("Cangelosi"), who serves as an attorney for the LSBC.  Specifically, Plaintiffs alleged that they were "harassed, intimidated, falsely imprisoned, and arbitrarily discriminated against or racially profiled based on their race, ethnicity or national origin by the Louisiana State Board of Cosmetology and/or its agents." (Doc. 1-1 at ¶ 5).[2]  Plaintiffs asserted claims of (1) racial discrimination in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution and (2) false imprisonment.[3]

Through the course of these proceedings, the Court dismissed the claims against eighteen Defendants and the claims of five Plaintiffs.  (*See* Docs. 62, 63, 146). In the instant Motion, Defendant Cangelosi seeks summary judgment on the claims of the four remaining Plaintiffs:  Thoa Nguyen, Hien Hoang, Uan Pham, and Mai Thi

---

[1] The parties agreed on certain undisputed facts contained herein. *Compare* Docs. 149-2, 151-2, 152-2, 156-3 (outlining facts that Defendant asserts as undisputed), *with* Docs. 155-2, 157-2, 159-2, 166-2 (outlining facts that Plaintiffs assert as undisputed).  All other facts recounted in this section are derived from the exhibits submitted by the parties and are accompanied by corresponding record citations.

[2] The Complaint alleges that Plaintiffs filed suit on their own behalf as well as on behalf of a class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23(a)-(b).  As explained in an earlier Ruling and Order, Plaintiffs did not comply with the Court's Local Rule regarding class actions, and no class has been certified in this matter.  *See* Doc. 61 at p. 2, n.2.

[3] In the Complaint and Amended Complaint, Plaintiffs did not allege a false imprisonment claim against Cangelosi.  *See* Doc. 1-1 at ¶¶28–32; Doc. 44.  Therefore, the only claim on which Cangelosi seeks summary judgment is the race discrimination claim.

Nguyen (collectively, "Plaintiffs").  The facts relevant to each Plaintiff are detailed below.

### A.    THOA NGUYEN D/B/A EXOTIC NAILS

Thoa Nguyen ("T. Nguyen") is the owner of the manicuring salon Exotic Nails in Lafayette, Louisiana.   On July 19, 2013, LSBC inspectors Sherrie Stockstill ("Stockstill") and Debra Ashmore ("Ashmore") inspected Exotic Nails at the direction of Stockstill's supervisor, Tywanda Spland.[4]  After the inspection, the inspectors noted four alleged violations on an Inspection Report and Notices of Violation that were issued.[5]  Some of the noted violations included the provision of services by unlicensed technicians and the presence of waxing equipment and supplies.[6]

The inspectors forwarded the Inspection Report and Notices of Violation to Cangelosi, whereafter Cangelosi would decide whether disciplinary proceedings were warranted.  Cangelosi drafted Informal Hearing Letters and sent the Letters to the Executive Director of the LSBC, Steven Young ("Director Young").  Director Young signed the Letters and sent them to T. Nguyen on September 16, 2013.  The Informal Hearing Letters notified T. Nguyen that he had ten days to demonstrate compliance with the Louisiana Cosmetology Act and that should he fail to do so, the matter would be scheduled for a formal hearing.

---

[4] The parties agree that Cangelosi was not involved in the inspection and did not oversee or supervise Stockstill or Ashmore.  Doc. 149-2 at p. 2.

[5] Inspection Reports and Notices of Violation are two separate, standard forms used by LSBC inspectors to document observations and violations.

[6] *See* Doc. 149-7, Inspection Report and Notices of Violation, dated July 19, 2013.

In February 2014, Cangelosi prepared formal charges to be brought against T. Nguyen pursuant to Louisiana Revised Statutes section 37:600. The charges were not finalized, however, due to the initiation of this action on February 6, 2014.

### B. HIEN HOANG D/B/A MAGIC NAILS

Hien Hoang ("Hoang") is the owner of the manicuring salon Magic Nails in Prairieville, Louisiana. Magic Nails was inspected by the LSBC three times within a fourteen-month period.[7] Stockstill conducted the first inspection on March 22, 2012. On the Inspection Report and Notice of Violation, Stockstill noted that the salon operated without a license and employed individuals without nail-technician licenses.[8] The same day, the LSBC sent Hoang a Cease and Desist Order, which was signed by Director Young. Shortly thereafter, Cangelosi successfully negotiated a Consent Agreement with Hoang to resolve the alleged violations that were discovered during the first inspection.

Four months after the first inspection, Stockstill conducted a second inspection on August 8, 2012. Stockstill noted on the Inspection Report and Notice of Violation that an unlicensed nail technician was performing manicures.[9] Upon receipt of the Inspection Report and Notice of Violation, Cangelosi drafted Informal Hearing Letters that were signed by Director Young and sent to Hoang on December 12, 2012. The Informal Hearing Letters notified Hoang that he had ten days to demonstrate

---

[7] The parties agree that Cangelosi was not involved in the inspections and did not oversee or supervise the inspectors. Doc. 151-2 at p. 1.

[8] *See* Doc. 151-6, Notice of Violation, dated March 22, 2012.

[9] *See* 151-12, Notice of Violation, dated August 8, 2012.

compliance with the Louisiana Cosmetology Act and that should he fail to do so, the matter would be scheduled for a formal hearing.  After Hoang failed to respond, Cangelosi prepared Formal Hearing Letters, setting the matter for a formal hearing on July 1, 2013.[10]

While the proceedings for the second inspection were pending, Stockstill – with the assistance of Margaret Keller ("Keller"), who also was an LSBC inspector – conducted a third inspection on May 3, 2013.  On the Inspection Report and Notices of Violation, the inspectors noted the presence of waxing equipment and supplies in the salon and that "a girl performing a pedicure . . . ran out the back door."[11]  The inspectors forwarded the Inspection Report and Notices of Violation to Cangelosi, and she prepared Informal Hearing Letters that were signed by Director Young and were sent to Hoang on June 11, 2013.

On June 14, 2013, the alleged violations from the second and third inspections were consolidated into Amended Notices to Show Cause.[12]  Cangelosi and Hoang's attorney negotiated proposed Consent Agreements to resolve all of the charges against Hoang listed in the Amended Notices to Show Cause. The Consent Agreements, however, were rejected at the LSBC hearing on August 5, 2013.

On August 16, 2013, Hoang received Formal Hearing Letters, Second Amended Notices to Show Cause, and Second Amended Administrative Complaints.  These

---

[10] The formal hearing was later rescheduled to July 8, 2013.

[11] *See* Doc. 151-15, Notices of Violation, dated May 3, 2013.

[12] *See* Docs. 151-23, 151-24, Amended Notices to Show Cause, dated June 14, 2013.

documents were prepared by Cangelosi and signed by Director Young. At the LSBC hearing on October 7, 2013, the proposed Consent Agreements were formally accepted.

### C. UAN PHAM D/B/A ELEGANT NAILS

Uan Pham ("Pham") is the owner of the manicuring salon Elegant Nails #2 in Lafayette, Louisiana. On August 28, 2013, Stockstill inspected the salon.[13] On the Inspection Report and Notice of Violation, Stockstill noted the presence of waxing equipment and supplies in the salon.[14] Stockstill forwarded the Inspection Report and Notice of Violation to Cangelosi, whereafter Cangelosi would decide whether disciplinary proceedings were warranted. Cangelosi drafted Informal Hearing Letters that were signed by Director Young and were sent to Pham on September 30, 2013.

The Informal Hearing Letters notified Pham that he had ten days to show compliance with the Louisiana Cosmetology Act and that should he fail to do so, the matter would be scheduled for a formal hearing. On October 3, 2013, Cangelosi and Pham negotiated proposed Consent Agreements. Pham received the proposed Consent Agreements from Cangelosi, but he did not return them to Cangelosi by the October 24, 2013, deadline.

---

[13] The parties agree that Cangelosi was not involved in the inspection and did not oversee or supervise Stockstill. Doc. 152-2 at p. 1.

[14] *See* Doc. 152-7, Notice of Violation, dated August 28, 2013.

On December 23, 2013, Pham called Cangelosi to negotiate new proposed Consent Agreements that would contain lesser fines.   The negotiations were unsuccessful.

Thereafter, Cangelosi prepared Formal Hearing Letters, Notices to Show Cause, and Administrative Complaints, which were signed by Director Young and were sent to Pham on or about January 8, 2014.  On January 30, 2014, Pham signed the Consent Agreements, which were accepted at the LSBC hearing on February 3, 2014.

### D.    MAI THI NGUYEN D/B/A NU NAILS

Mai Thi Nguyen ("M. Nguyen") is the owner of the manicuring salon Nu Nails in Gonzales, Louisiana.  M. Nguyen purchased the salon from Thu Nguyen on August 14, 2013.[15]  According to Plaintiffs, the previous owner, Thu Nguyen, operated the salon in violation of LSBC regulations.[16]  On September 5, 2013, Stockstill inspected the salon.  In the Inspection Report and Notice of Violation, Stockstill noted that the salon was operating without the benefit of approved-shop or manager licenses.[17]  The next day, the LSBC sent M. Nguyen a Cease and Desist Order signed by Director Young.  Thereafter, Cangelosi received the Inspection Report and Notice of Violation from Stockstill and was made aware of the Cease and Desist Order.

On September 11, 2013, M. Nguyen applied for a manicuring-salon license.  M. Nguyen's application was immediately forwarded to Cangelosi.

---

[15] *See* Doc. 1 at p. 9; Doc. 156-16, Bill of Sale, dated August 14, 2013.

[16] *See* Doc. 1 at p. 9.

[17] *See* Doc. 156-10, Inspection Report and Notice of Violation, dated September 5, 2013.

On September 14, 2013, three days after M. Nguyen applied for a manicuring-salon license, Cangelosi's legal assistant – Terri Clark ("Clark") – patronized Nu Nails.  During her deposition testimony, Clark testified that she repeatedly "bugged" Cangelosi for authorization to patronize the salon because it "irritate[d]" her to see the salon operating unlawfully.[18]  Cangelosi authorized Clark to patronize the salon and reimbursed her for the services rendered during her visit.[19]

On September 25, 2013, the LSBC sent M. Nguyen a Rule to Show Cause Why Application Should Not Be Denied ("Rule to Show Cause"), which was prepared by Cangelosi and signed by Director Young.  The Rule to Show Cause directed M. Nguyen to demonstrate why her application should not be denied on grounds of (1) attempting to obtain a salon license by means of fraud, misrepresentation, or the concealment of facts and (2) operating a salon without a license.[20]  The LSBC hearing on the Rule to Show Cause was scheduled for December 2, 2013.[21]

While the Rule to Show Cause was pending, Stockstill conducted a second inspection of the salon on October 1, 2013.  On the Inspection Report, Stockstill noted that the inspection was a follow-up visit, conducted at the direction of Director Young and Cangelosi.[22]  Stockstill also noted that the salon was a fully equipped nail salon

---

[18] Doc. 166-3, Dep. of Clark, at p. 23, ll. 23-25; *id.* at p. 24, ll. 1-13; *id.* at p. 30, ll. 18-19.

[19] *Id.* at p. 24, ll. 10-25.

[20] *See* Doc. 156-20, Rule to Show Cause, dated September 25, 2013.

[21] *Id.*

[22] *See* Doc. 156-26, Inspection Report, dated October 1, 2013.

operating without a license.[23] That same day, Cangelosi sent M. Nguyen a personally signed letter notifying her that she was in violation of the Cease and Desist Order.[24]

The LSBC hearing on the Rule to Show Cause, which was scheduled for December 2, 2013, was rescheduled to December 9, 2013. At the LSBC hearing on December 9, 2013, Cangelosi called Clark as a witness.[25] The LSBC issued Findings of Fact, Conclusions of Law, and an Order granting M. Nguyen's application for a salon license, subject to a one-year probationary period.[26]

## II.    STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers," or by averring that an adverse party cannot produce admissible evidence to support the presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1)(A).

---

[23] *Id.*

[24] *See* Doc. 156-28, Letter from Cangelosi to M. Nguyen, dated October 1, 2013.

[25] Doc. 149-11, Dep. Of Cangelosi, at p. 46, ll. 3-6.

[26] *See* Doc. 114-11, LSBC Hr'g Tr., at p. 130, ll. 9-13.

"[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and footnote omitted). "This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation marks and citations omitted). In determining whether the movant is entitled to summary judgment, the Court "view[s] facts in the light most favorable to the non-movant and draw[s] all reasonable inferences in her favor." *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

In sum, summary judgment is appropriate if, "after adequate time for discovery and upon motion, [the non-movant] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.   DISCUSSION

Cangelosi raises the defenses of absolute immunity and qualified immunity. In the alternative, Cangelosi moves for summary judgment on the ground that there is no genuine dispute as to any material fact relating to Plaintiffs' race discrimination claims. For the reasons discussed herein, the Court finds that summary judgment is appropriate on Plaintiff T. Nguyen's, Plaintiff Hoang's, and Plaintiff Pham's claims

10

against Defendant Cangelosi, but summary judgment is not appropriate on Plaintiff M. Nguyen's claim against Defendant Cangelosi.

## A.    ABSOLUTE IMMUNITY

Absolute immunity "denies a person whose federal rights have been violated by a government official any type of remedy, regardless of the conduct." *O'Neal v. Miss. Bd. of Nursing*, 113 F.3d 62, 65 (5th Cir. 1997). Government officials to whom absolute immunity is extended "include judges performing judicial acts within their jurisdiction, prosecutors in the performance of their official functions, and certain 'quasi-judicial' agency officials who, irrespective of their title, perform functions essentially similar to those of judges or prosecutors, in a setting similar to that of a court." *Id.* (citations omitted).

In determining whether absolute immunity extends to a particular government official, "the proper focus should not be the identity of the party claiming the immunity, but rather his 'role in the context of the case.'" *Id.* (quoting *Mays v. Sudderth*, 97 F.3d 107, 110 (5th Cir. 1996)). Under this "functional approach" to the application of absolute immunity, the United States Court of Appeals for the Fifth Circuit has directed courts to analyze the "nature of the function performed" by the government official. *Beck v. Tex. State Bd. of Dental Examiners*, 204 F.3d 629, 634 (5th Cir. 2000). "In other words, immunity attaches to particular official functions, not to particular offices." *O'Neal*, 113 F.3d at 65.

Absolute immunity extends to officials whose responsibilities are functionally comparable to those of judges and prosecutors. *See id.* at 67. The Fifth Circuit has recognized absolute immunity for officials that are members, attorneys, and directors

11

of professional licensing boards. *See, e.g.*, *Di Ruzzo v. Tabaracci*, 480 F. App'x 796 (5th Cir. 2012) (recognizing absolute immunity for attorneys and board members of the Texas Medical Board); *Beck*, 204 F.3d 629 (recognizing absolute immunity for board members of the Texas State Board of Dental Examiners); *O'Neal*, 113 F.3d 62 (recognizing absolute immunity for board members and the director of the Mississippi State Board of Nursing).   However, when a member, attorney, or director of a professional licensing board performs an "investigative" function, as opposed to "either an adjudicative or prosecutorial function," that person is not entitled to absolute immunity. *Beck*, 204 F.3d at 637; *see Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" (quoting *Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1973))).

Cangelosi serves as an attorney for the LSBC, a professional licensing board that oversees cosmetology licenses in the State of Louisiana.[27]   The Louisiana Cosmetology Act ("Cosmetology Act"), La. Rev. Stat. § 37:561 *et seq.*, empowers the LSBC to issue licenses and conduct investigations, inquiries, and hearings to ensure compliance with the Cosmetology Act.[28]   La. Rev. Stat. § 37:575.

---

[27] Cangelosi's role as an attorney for the LSBC is two-fold.   Cangelosi interchangeably serves as Complaint Counsel and Board Advisor.   Although Cangelosi testified that she primarily serves as Complaint Counsel, the Informal Hearing Letters identify her as "the Board's attorney."   Nonetheless, the title of her position is irrelevant to the absolute immunity analysis because the Court is bound to focus on the *function* of her position, not the title.   *See Beck*, 204 F.3d at 634.

[28] Pursuant to Louisiana Revised Statutes section 37:575, the LSBC is "responsible for the control and regulation of the practice of cosmetology."   La. Rev. Stat. § 37:575(A).   *Cosmetology* is defined as "the practice of using one's hands, mechanical or electrical apparatuses, or appliances or using

As an attorney for the LSBC, Cangelosi serves in a role that is "functionally comparable" to a prosecutor:  Cangelosi initiates disciplinary proceedings, negotiates consent agreements, and presents evidence on behalf of the LSBC during hearings.[29] These actions, which are prosecutorial in nature, are entitled to absolute immunity. *See Di Ruzzo*, 480 F. App'x at 797 (recognizing absolute immunity for attorneys of the Texas Medical Board).

Cangelosi's conduct in the cases of T. Nguyen, Hoang, and Pham was soley prosecutorial in nature.  In the cases of those three Plaintiffs, Cangelosi notified the Plaintiffs of the alleged violations, negotiated consent agreements, initiated disciplinary proceedings, and presented evidence during the LSBC hearings. Cangelosi thus did not exceed the traditional and customary functions of a prosecutor. Therefore, Cangelosi is entitled to absolute immunity on the claims of T. Nguyen, Hoang, and Pham.  *See id.*

Cangelosi's conduct in the case of M. Nguyen, however, was *not* limited to the traditional and customary functions of a prosecutor.  In M. Nguyen's case, Cangelosi assumed the role of both a prosecutor *and* an investigator.  When Cangelosi authorized her legal assistant, Clark, to patronize M. Nguyen's salon, Cangelosi

---

cosmetic preparations, antiseptics, soaps, detergents, tonics, lotions, or creams in any one or any combination of the practices of esthetics, hair dressing, and manicuring for compensation, direct or indirect, including tips." La. Rev. Stat. § 37:563.

[29] *See* Doc. 149-4, Dep. of Young, at p. 88, ll. 9-19; *id.* at p. 89, ll. 1-3; *id.* at p. 104, ll. 7-25; *id.* at p. 105, ll. 1-2; Doc. 149-11, Dep. of Cangelosi, at p. 8, ll. 9-24; *id.* at p. 22, ll. 10-25; *id.* at p.23, ll. 1-12; *id.* at p. 45, ll. 3-5.

assumed the role of an investigative officer.[30]  The undisputed evidence revealed that Clark visited the salon for the sole purpose of gathering evidence of M. Nguyen's operating the salon in violation of the Cease and Desist Order.[31]   Cangelosi authorized the investigation by approving Clark's request to patronize the salon and by reimbursing Clark for the services she received while at the salon.[32]

The patronage of Clark was an investigation that was authorized by Cangelosi, and the authorization of that investigation exceeded Cangelosi's prosecutorial function. Under the LSBC paradigm, inspectors gather evidence; the attorneys evaluate the evidence, initiate proceedings, and present the evidence at LSBC hearings.[33]  In the matter of M. Nguyen, Cangelosi gathered evidence by authorizing Clark to patronize the salon; Cangelosi, based on the evidence obtained through Clark's investigation, later initiated proceedings by drafting the Rule to Show Cause

---

[30] Cangelosi argues that the patronage of Clark was a permissible investigation because it occurred after the Cease and Desist Order was issued and was similar to investigative functions that occur after indictments are returned.  Doc. 156-2 at p. 18.  According to Cangelosi, the return of an indictment creates a distinct demarcation between a prosecutor's investigative conduct that *is* entitled to absolute immunity and that which is not.  *See id.*  Cangelosi cites *Burge v. Par. of St. Tammany*, 187 F.3d 452, 478 (5th Cir. 1999), to support her claim that after an indictment is returned, a prosecutor's investigative conduct is entitled to absolute immunity.

The Fifth Circuit in *Burge* did not establish the rule that Cangelosi seeks to advance.  In *Burge*, the Fifth Circuit looked to the *function* of the official.  *See id.*  The Fifth Circuit concluded that the official was an investigator because he gathered evidence prior to the indictment and did not engage in the traditional functions of a prosecutor.  *See id.*  The nature of the *function* of the official was integral to the Fifth Circuit's decision in *Burge*, not the temporal proximity of the official's conduct to the indictment.  *See id.*

[31] *See* Doc. 156-19.

[32] *Id.*

[33] *See* Doc. 149-4, Dep. of Young.

and called Clark as a witness during the hearing on the Rule to Show Cause. Cangelosi thus assumed the role of an *inspector*, as well as a prosecutor.

Therefore, Defendant Cangelosi is not entitled to absolute immunity on the claim of Plaintiff M. Nguyen. *See Beck*, 204 F.3d at 637.

## B.   QUALIFIED IMMUNITY

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)).

Cangelosi previously raised the defense of qualified immunity in motions to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6).[34] The Court denied, without prejudice, Cangelosi's assertion of qualified immunity as a defense because it was inapplicable; Plaintiffs have sued Cangelosi in her official capacity. *Nguyen v. La. State Bd. of Cosmetology*, No. 14-cv-00080-BAJ-RLB, 2015 WL 590006, at *7 (M.D. La. Feb. 11, 2015). As this Court previously noted, "[q]ualified immunity is applicable to bar suit only to the extent a defendant is sued in her *individual* capacity." *Id.* at *7 (emphasis added) (citing *Walker v. Howard*, 517 F. App'x 236, 237 (5th Cir. 2013)). The Complaint and the Amended Complaint only

---

[34] *See* Doc. 46.

allege an *official* capacity claim against Cangelosi,[35] and therefore the defense of qualified immunity is inapplicable. *Walker*, 517 F. App'x at 237.

### C.   RACE DISCRIMINATION

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The central purpose of the Equal Protection Clause "is to prevent the States from purposely discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993). Indeed, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher v. Univ. of Tex. at Austin*, ___ U.S. ____, 133 S. Ct. 2411, 2418 (2013) (internal quotation marks and citations omitted). The United States Supreme Court has held, however, that a law "neutral on its face and serving ends otherwise within the power of government to pursue . . . is [not] invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." *Id.* "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

---

[35] *See* Docs. 1, 44.

Although "such cases are rare," the Court has held that "sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.* at 266 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Guinn v. United States*, 238 U.S. 347 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960)). "Absent a pattern as stark as that in *Gomillion* [*v. Lightfoot*] or *Yick Wo* [*v. Hopkins*], impact alone is not determinative, and the Court must look to other evidence." *Id.*

In *Yick Wo*, the San Francisco Board of Supervisors passed an ordinance that made it unlawful for a person to operate a laundry in a structure that was constructed of wood.  118 U.S. 358.  Of the 320 laundries being operated in San Francisco at that time, approximately 310 were constructed of wood, and approximately 240 of those laundries were operated by persons of Chinese heritage.  *Id.* at 358-59.  Over 200 Chinese owners of those laundries petitioned the Board of Supervisors for permission to continue to operate laundries in the wooden structures in which they had been conducting business for several years, but all of those petitions were denied.  *Id.* at 359.  On the other hand, all but one of the similar petitions submitted by non-Chinese owners of laundries were granted.  *Id.*  The Court held that "[t]hough the law itself [was] fair on its face and impartial in appearance," the "ordinances in actual operation, and the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial

by the state of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the Fourteenth Amendment to the Constitution of the United States." *Id.* at 373. The Court held that the ordinance violated the Equal Protection Clause, reasoning that if a law "is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution" notwithstanding the facial neutrality of the law. *Id.* at 373-74.

Similarly, in *Gomillion*, the Alabama Legislature passed an act that redefined the boundaries of the City of Tuskegee, "which altered the shape of Tuskegee from a square to an uncouth twenty-eight-sided figure," 364 U.S. at 340, and "remove[d] from the city all [but] four or five of its 400 Negro voters while not removing a single white voter or resident," *id.* at 341. The Court held that "[i]f these allegations upon a trial remained uncontradicted or unqualified, the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration, that the legislation is solely concerned with segregating white and colored voters by fencing Negro citizens out of town so as to deprive them of their pre-existing municipal vote," thereby violating the Equal Protection Clause. *Id.* at 341.

Plaintiffs have produced evidence that indicates that persons of Vietnamese heritage own only 9% of the approximately 7,500 salons within the LSBC's regulatory

mandate,[36] but Vietnamese-owned salons paid 80.1% of all fines imposed by the LSBC in 2011, 89.2% of all fines imposed by the LSBC in 2012, and 91% of all fines imposed by the LSBC in 2013.[37]  If these figures are proven by a preponderance of the evidence at trial, a jury could reasonably find that this case presents the type of "pattern as stark as that in *Gomillion* or *Yick Wo*," requiring Plaintiff to produce no further evidence of racially discriminatory intent.[38]  *Arlington Heights*, 429 U.S. at 266.

Defendant argues that the percentage of fines imposed on Vietnamese-owned salons should not be viewed in light of *all* the salons within the LSBC's regulatory mandate, but rather in light of manicuring salons *only*.[39]  Director Young, in his deposition testimony, estimated that 80% of all manicuring salons are owned by persons of Vietnamese heritage.[40]  Defendant argues that M. Nguyen must identify "non-Vietnamese manicurist[s]" as a similarly situated class in order to establish an

---

[36] *See* Doc. 167-3 at p. 35, ll. 5-9, 16-17; *id.* at p. 36, l. 1.  In arriving at the figure of 9%, Plaintiff cites the deposition testimony of Director Young, who testified that (1) the LSBC regulated approximately 7,500 salons, (2) approximately 850 to 900 of those 7,500 salons are manicuring salons, and (3) "80[%] or above" of those manicuring salons are owned by persons of Vietnamese heritage.  *Id.*

[37] *Compare* Doc. 114-8 (compiling fines imposed against salons that are not owned by persons of Vietnamese heritage), *with* Doc. 114-9 (compiling fines imposed against salons that are owned by persons of Vietnamese heritage).

[38] Such other evidence, pursuant to *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, may include "[t]he specific sequence of events leading up to the challenged decision," which "may shed light on the decisionmaker's purposes."  429 U.S. at 267.  Although M. Nguyen cites no evidence that either Clark – by patronizing the salon and conducting a de facto investigation – or Cangelosi – by authorizing Clark to patronize the salon and reimbursing her for the services rendered during her de facto investigation – were motivated explicitly by racially discriminatory intent, the sequence of events could be relevant to this factor under the *Arlington Heights* framework due to the exceptional nature of Cangelosi's act of authorizing her legal assistant – who was not an authorized inspector – to conduct a de facto investigation of a particular salon.

[39] *See* Doc. 178 at pp. 3-4.  Defendant Cangelosi asserted in her Reply (Doc. 178) that Plaintiff has not put forth any similarly situated person to compare to herself for the purpose of proving that discrimination on the basis of race occurred.  *Id.*

[40] Doc. 167-3 at p. 36, l. 1.

equal protection violation.  Because of the high rate of manicure-salon ownership by persons of Vietnamese heritage, Defendant's argument follows, the imposition of fines against such salons at a similarly high rate is not unusual, let alone indicative of the "stark" pattern noted by the Court in *Gomillion* and *Yick Wo*.[41]

Because the parties dispute whether the fines imposed by the LSBC against salons owned by persons of Vietnamese heritage should be viewed in light of *all* the salons within the LSBC's regulatory mandate, or simply the manicuring salons that the LSBC regulates, and such a distinction is essential in determining whether there is a "clear pattern, unexplainable on grounds other than race" similar to the pattern in *Yick Wo*, *Arlington Heights*, 429 U.S. at 266, summary judgment is not proper. This question – whether the rate of fines imposed on salons owned by persons of Vietnamese heritage should be viewed in light of *all* salons or merely manicuring salons – is a "genuine issue for trial." *Anderson*, 477 U.S. at 250.  That question should be submitted to a jury, and therefore Defendant Cangelosi is not entitled to summary judgment on her claim against Plaintiff M. Nguyen.

---

[41] This argument is presented more comprehensively in the LSBC, Stockstill, and Keller's Memorandum in Support of their Motion for Summary Judgment, *see* Doc. 162-1 at p. 9-10, which is not the subject of this Ruling and Order.

IV.     **CONCLUSION**

Based on the foregoing,

**IT IS ORDERED** that Defendant's **Motions for Summary Judgment (Docs. 149, 151, 152)** pertaining to Plaintiffs **Thoa Nguyen**, **Hien Hoang**, and **Uan Pham** are **GRANTED.**

**IT IS FURTHER ORDERED** that Defendant's **Motion for Summary Judgment (Doc. 156)** pertaining to Plaintiff **Mai Thi Nguyen** is **DENIED.**

**IT IS FURTHER ORDERED** that the claims of **Thoa Nguyen d/b/a Exotic Nails**, **Hien Hoang d/b/a Magic Nails**, and **Uan Pham d/b/a Elegant Nails #2** against **Celia R. Cangelosi** are **DISMISSED WITH PREJUDICE**.

Baton Rouge, Louisiana, this _16th_ day of December, 2016.

**BRIAN A. JACKSON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

21