UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

THOA T. NGUYEN, ET AL.                                          CIVIL ACTION

VERSUS

LOUISIANA STATE BOARD OF                          NO.: 14-00080-BAJ-RLB
COSMETOLOGY, ET AL.

RULING AND ORDER

Before the Court is the **Motion for Summary Judgment (Doc. 162)** filed by

Defendants Louisiana State Board of Cosmetology, Sherrie Stockstill, and Margaret

Keller.  Defendants seek summary judgment on the claims asserted by Plaintiffs

Thoa Nguyen d/b/a Exotic Nails, Hien Hoang d/b/a Magic Nails, Uan Pham d/b/a

Elegant Nails #2, and Mai Thi Nguyen d/b/a Nu Nails.  Plaintiffs filed a joint

memorandum in opposition to the Motion, (*see* Doc. 180), and Defendants filed a reply

to Plaintiffs' memorandum in opposition, (*see* Doc. 179).  On January 17, 2017, the

Court held a hearing on the Motion.  The Court has jurisdiction pursuant to 28 U.S.C.

§§ 1331, 1367.  For the reasons explained herein, Defendants' **Motion for Summary**

**Judgment (Doc. 162)** is **DENIED**.

## I.   BACKGROUND[1]

This action was initiated on February 6, 2014, by nine nail-salon owners of Vietnamese and Asian heritage.  The nine Plaintiffs sought injunctive relief and damages against the Louisiana State Board of Cosmetology ("LSBC") and individuals associated with the LSBC (collectively, "Defendants") – including Sherrie Stockstill ("Stockstill") and Margaret Keller ("Keller"), who are inspectors for the LSBC. Specifically, Plaintiffs alleged that they were "harassed, intimidated, falsely imprisoned, and arbitrarily discriminated against or racially profiled based on their race, ethnicity or national origin by the Louisiana State Board of Cosmetology and/or its agents." (Doc. 1-1 at ¶ 5).[2]  Plaintiffs asserted claims of (1) racial discrimination in violation of 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution and (2) false imprisonment.

Through the course of these proceedings, the Court dismissed the claims against nineteen Defendants and the claims of five Plaintiffs.  (*See* Docs. 62, 63, 146, 195, 210).  In the instant Motion, Defendants seek summary judgment on the claims of the four remaining Plaintiffs:  Thoa Nguyen, Hien Hoang, Uan Pham, and Mai Thi

---

[1] The parties agreed on certain undisputed facts contained herein. *Compare* Doc. 162-2 (outlining facts that Defendants assert as undisputed), *with* Doc. 167-2 (outlining facts that Plaintiffs assert as undisputed).  All other facts recounted in this section are derived from the exhibits submitted by the parties and are accompanied by corresponding record citations.

[2] The Complaint alleges that Plaintiffs filed suit on their own behalf as well as on behalf of a class of similarly situated persons pursuant to Federal Rule of Civil Procedure 23(a)-(b).  As explained in an earlier Ruling and Order, Plaintiffs did not comply with the Court's Local Rule regarding class actions, and no class has been certified in this matter.  *See* Doc. 61 at p. 2, n.2.

Nguyen (collectively, "Plaintiffs").  The facts relevant to each Plaintiff are detailed below.

### A.    Thoa Nguyen d/b/a Exotic Nails

Thoa Nguyen ("T. Nguyen") is the owner of the manicuring salon Exotic Nails in Lafayette, Louisiana.  On July 19, 2013, Stockstill, along with Debra Ashmore, inspected Exotic Nails at the direction of Stockstill's supervisor, Tywanda Spland. After the inspection, the inspectors noted four alleged violations on an Inspection Report and Notices of Violation that were issued.[3]  Some of the noted violations included the provision of services by unlicensed technicians and the presence of waxing equipment and supplies.

The inspectors forwarded the Inspection Report and Notices of Violation to Celia Cangelosi ("Cangelosi"), who serves as an attorney for the LSBC, whereafter Cangelosi would decide whether disciplinary proceedings were warranted.  Cangelosi drafted Informal Hearing Letters and sent the Letters to the Executive Director of the LSBC, Steven Young ("Director Young").  Director Young signed the Letters and sent them to T. Nguyen on September 16, 2013.  The Informal Hearing Letters notified T. Nguyen that she had ten days to demonstrate compliance with the Louisiana Cosmetology Act and that should she fail to do so, the matter would be scheduled for a formal hearing.

---

[3] Inspection Reports and Notices of Violation are two separate, standard forms used by LSBC inspectors to document observations and violations.

3

In February 2014, Cangelosi prepared formal charges to be brought against T. Nguyen pursuant to Louisiana Revised Statutes section 37:600. The charges were not finalized, however, due to the initiation of this action on February 6, 2014.

### B.     Hien Hoang d/b/a Magic Nails

Hien Hoang ("Hoang") is the owner of the manicuring salon Magic Nails in Prairieville, Louisiana. Magic Nails was inspected by the LSBC three times within a fourteen-month period. Stockstill conducted the first inspection on March 22, 2012. On the Inspection Report and Notice of Violation, Stockstill noted that the salon operated without a license and employed individuals without nail-technician licenses.[4] The same day, the LSBC sent Hoang a Cease and Desist Order, which was signed by Director Young. Shortly thereafter, Cangelosi successfully negotiated a Consent Agreement with Hoang to resolve the alleged violations that were discovered during the first inspection.

Four months after the first inspection, Stockstill conducted a second inspection on August 8, 2012. Stockstill noted on the Inspection Report and Notice of Violation that an unlicensed nail technician was performing manicures.[5] Upon receipt of the Inspection Report and Notice of Violation, Cangelosi drafted Informal Hearing Letters that were signed by Director Young and sent to Hoang on December 12, 2012. The Informal Hearing Letters notified Hoang that he had ten days to demonstrate compliance with the Louisiana Cosmetology Act and that should he fail to do so, the

---

[4] *See* Doc. 162-6 at pp. 1-2, Notice of Violation, dated March 22, 2012.

[5] *See id.* at pp. 15-16, Notice of Violation, dated August 8, 2012.

matter would be scheduled for a formal hearing.  After Hoang failed to respond, Cangelosi prepared Formal Hearing Letters, setting the matter for a formal hearing on July 1, 2013.[6]

While the proceedings related to the second inspection were pending, Stockstill – with the assistance of Keller – conducted a third inspection on May 3, 2013.  On the Inspection Report and Notices of Violation, the inspectors noted the presence of waxing equipment and supplies in the salon and that "a girl performing a pedicure . . . ran out the back door."[7]  The inspectors forwarded the Inspection Report and Notices of Violation to Cangelosi, and she prepared Informal Hearing Letters that were signed by Director Young and were sent to Hoang on June 11, 2013.

On June 14, 2013, the alleged violations from the second and third inspections were consolidated into Amended Notices to Show Cause.  Cangelosi and Hoang's attorney negotiated proposed Consent Agreements to resolve all of the charges against Hoang that were listed in the Amended Notices to Show Cause. The Consent Agreements, however, were rejected at the LSBC hearing on August 5, 2013.[8]

On August 16, 2013, Hoang received Formal Hearing Letters, Second Amended Notices to Show Cause, and Second Amended Administrative Complaints.  These documents were prepared by Cangelosi and signed by Director Young.  At the LSBC

---

[6] The formal hearing was rescheduled to July 8, 2013.

[7] *See* Doc. 162-6 at pp. 33-34, Notices of Violation, dated May 3, 2013.

[8] The parties have not elaborated on the reason for the Consent Agreements' rejection.  *See* Doc. 162-2 at ¶ 58; Doc. 167-2 at ¶ 58.

hearing on October 7, 2013, the proposed Consent Agreements were formally accepted.

### C.     Uan Pham d/b/a Elegant Nails #2

Uan Pham ("Pham") is the owner of the manicuring salon Elegant Nails #2 in Lafayette, Louisiana.  On August 28, 2013, Stockstill inspected the salon.  On the Inspection Report and Notice of Violation, Stockstill noted the presence of waxing equipment and supplies in the salon.  Stockstill forwarded the Inspection Report and Notice of Violation to Cangelosi, whereafter Cangelosi would decide whether disciplinary proceedings were warranted.  Cangelosi drafted Informal Hearing Letters that were signed by Director Young and were sent to Pham on September 30, 2013.

The Informal Hearing Letters notified Pham that he had ten days to show compliance with the Louisiana Cosmetology Act and that should he fail to do so, the matter would be scheduled for a formal hearing.  On October 3, 2013, Cangelosi and Pham negotiated proposed Consent Agreements.  Pham received the proposed Consent Agreements from Cangelosi, but he did not return them to Cangelosi by the October 24, 2013, deadline.

On December 23, 2013, Pham called Cangelosi to negotiate new proposed Consent Agreements that would contain lesser fines.  The negotiations were unsuccessful.

Thereafter, Cangelosi prepared Formal Hearing Letters, Notices to Show Cause, and Administrative Complaints, which were signed by Director Young and were sent to Pham on or about January 8, 2014.  On January 30, 2014, Pham signed

6

the Consent Agreements, which were accepted at the LSBC hearing on February 3, 2014.

### D.     Mai Thi Nguyen d/b/a Nu Nails

Mai Thi Nguyen ("M. Nguyen") is the owner of the manicuring salon Nu Nails in Gonzales, Louisiana.  M. Nguyen purchased the salon from Thu Nguyen on August 14, 2013.  According to Plaintiffs, the previous owner, Thu Nguyen, operated the salon in violation of LSBC regulations.[9]  On September 5, 2013, Stockstill inspected the salon.  On the Inspection Report and Notice of Violation, Stockstill noted that the salon was operating without the benefit of a license.  The next day, the LSBC sent M. Nguyen a Cease and Desist Order signed by Director Young.  Thereafter, Cangelosi received the Inspection Report and Notice of Violation from Stockstill and was made aware of the Cease and Desist Order.

On September 11, 2013, M. Nguyen applied for a manicuring-salon license.  M. Nguyen's application was immediately forwarded to Cangelosi.

On September 25, 2013, the LSBC sent M. Nguyen a Rule to Show Cause Why Application Should Not Be Denied ("Rule to Show Cause"), which was prepared by Cangelosi and signed by Director Young.  The Rule to Show Cause directed M. Nguyen to demonstrate why her application should not be denied on grounds of (1) attempting to obtain a salon license by means of fraud, misrepresentation, or the

_____

[9] *See* Doc. 1 at p. 9.

7

concealment of facts and (2) operating a salon without a license.[10]  The LSBC hearing on the Rule to Show Cause was scheduled for December 2, 2013.

While the Rule to Show Cause was pending, Stockstill conducted a second inspection of the salon on October 1, 2013.  On the Inspection Report, Stockstill noted that the inspection was a follow-up visit, conducted at the direction of Director Young and Cangelosi.[11]  Stockstill also noted that the salon was a fully equipped nail salon operating without a license.[12]  That same day, Cangelosi sent M. Nguyen a personally signed letter notifying her that she was in violation of the Cease and Desist Order.

The LSBC hearing on the Rule to Show Cause, which was scheduled for December 2, 2013, was rescheduled to December 9, 2013.  The LSBC issued Findings of Fact, Conclusions of Law, and an Order granting M. Nguyen's application for a salon license, subject to a one-year probationary period.[13]

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of

---

[10] *See* Doc. 162-7 at p. 78, Rule to Show Cause, dated September 25, 2013.

[11] *See id.* at p. 98, Inspection Report, dated October 1, 2013.

[12] *Id.*

[13] *See* Doc. 162-8 at pp. 32-35, Findings of Fact, Conclusions of Law and Order, dated December 9, 2013.

materials in the record [–] including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, [and] interrogatory answers" – or by averring that an adverse party cannot produce admissible evidence to support the presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1).

"[W]hen a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and footnote omitted). "This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quotation marks and citations omitted). In determining whether the movant is entitled to summary judgment, the Court "view[s] facts in the light most favorable to the non-movant and draw[s] all reasonable inferences in her favor." *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997).

In sum, summary judgment is appropriate if, "after adequate time for discovery and upon motion, [the non-movant] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

III.   DISCUSSION

Defendants assert that (1) they are entitled to summary judgment as a matter of law on Plaintiffs' race discrimination claims because Plaintiffs have not established an equal protection violation; (2) there are no remaining claims against Keller, and she therefore should be dismissed as a Defendant in this matter; (3) Stockstill and Keller are entitled to qualified immunity; (4) the LSBC is entitled to Eleventh Amendment immunity; (5) the LSBC is entitled to summary judgment on Plaintiffs' race discrimination claims because vicarious liability is not recognized under 42 U.S.C. § 1983, Plaintiffs have failed to produce evidence of direct action by the LSBC, and the LSBC is not liable for the acts of Cangelosi because under Louisiana law, Cangelosi is an independent contractor.  For the reasons discussed herein, the Court finds that summary judgment is not appropriate on any of Plaintiffs' claims against Defendants.

A.    Race Discrimination

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.  The central purpose of the Equal Protection Clause "is to prevent the States from purposely discriminating between individuals on the basis of race." *Shaw v. Reno*, 509 U.S. 630, 642 (1993).  Indeed, "[d]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher v. Univ. of Tex. at Austin*, ___ U.S. ___, 133 S. Ct. 2411, 2418 (2013) (internal quotation marks and citations omitted).  The United States Supreme Court

10

has held, however, that a law "neutral on its face and serving ends otherwise within the power of government to pursue . . . is [not] invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another." *Washington v. Davis*, 426 U.S. 229, 242 (1976). "Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution." *Id.* "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).

Although "such cases are rare," the Supreme Court has held that "sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Id.* at 266 (citing *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Guinn v. United States*, 238 U.S. 347 (1939); *Gomillion v. Lightfoot*, 364 U.S. 339 (1960)). "Absent a pattern as stark as that in *Gomillion* [*v. Lightfoot*] or *Yick Wo* [*v. Hopkins*], impact alone is not determinative, and the Court must look to other evidence." *Id.*

In *Yick Wo*, the San Francisco Board of Supervisors passed an ordinance that made it unlawful for a person to operate a laundry in a structure that was constructed of wood. *See* 118 U.S. 358. Of the 320 laundries being operated in San Francisco at that time, approximately 310 were constructed of wood, and approximately 240 of those laundries were operated by persons of Chinese heritage. *Id.* at 358-59. Over 200 Chinese owners of those laundries petitioned the Board of Supervisors for permission to continue to operate laundries in the wooden structures in which they had been conducting business for several years, but all of those petitions were denied.

11

*Id.* at 359.  On the other hand, all but one of the similar petitions submitted by non-Chinese owners of laundries were granted.  *Id.*  The Court held that "[t]hough the law itself [was] fair on its face and impartial in appearance," the "ordinances in actual operation, and the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the Fourteenth Amendment to the Constitution of the United States."  *Id.* at 373.  The Court held that the ordinance violated the Equal Protection Clause, reasoning that if a law "is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution," notwithstanding the facial neutrality of the law.  *Id.* at 373-74.

Similarly, in *Gomillion*, the Alabama Legislature passed an act that redefined the boundaries of the City of Tuskegee, "which altered the shape of Tuskegee from a square to an uncouth twenty-eight-sided figure," 364 U.S. at 340, and "remove[d] from the city all [but] four or five of its 400 Negro voters while not removing a single white voter or resident," *id.* at 341.  The Court held that "[i]f these allegations upon a trial remained uncontradicted or unqualified, the conclusion would be irresistible,

12

tantamount for all practical purposes to a mathematical demonstration, that the legislation is solely concerned with segregating white and colored voters by fencing Negro citizens out of town so as to deprive them of their pre-existing municipal vote," thereby violating the Equal Protection Clause. *Id.* at 341.

Plaintiffs have produced evidence that indicates that persons of Vietnamese heritage own only 9% of the approximately 7,500 salons within the LSBC's regulatory mandate,[14] but Vietnamese-owned salons paid 80.1% of all fines imposed by the LSBC in 2011, 89.2% of all fines imposed by the LSBC in 2012, and 91% of all fines imposed by the LSBC in 2013.[15] Plaintiffs similarly assert that persons of Vietnamese heritage disproportionately were subjected to hearings held before the LSBC in reference to alleged violations of regulations in light of the small number of salons that are owned by persons of Vietnamese heritage. Plaintiffs direct the court to the deposition testimony of Director Young, who agreed with the statement that the group of persons most often subjected to LSBC hearings were persons of Vietnamese heritage; Director Young estimated that 90% of all persons subjected to LSBC hearings were of Vietnamese heritage.[16] If these figures are proven by a preponderance of the evidence at trial, a jury could reasonably find that this case

---

[14] *See* Doc. 167-3 at p. 35, ll. 5-9, 16-17; *id.* at p. 36, l. 1. In arriving at the figure of 9%, Plaintiffs cite the deposition testimony of Director Young, who testified that (1) the LSBC regulated approximately 7,500 salons, (2) approximately 850 to 900 of those 7,500 salons are manicuring salons, and (3) "80[%] or above" of those manicuring salons are owned by persons of Vietnamese heritage. *Id.*

[15] *Compare* Doc. 114-8 (compiling fines imposed against salons that are *not* owned by persons of Vietnamese heritage), *with* Doc. 114-9 (compiling fines imposed against salons that are owned by persons of Vietnamese heritage).

[16] *See* Doc. 167-3 at p. 128.

13

presents the type of "pattern as stark as that in *Gomillion* or *Yick Wo*," requiring Plaintiff to produce no further evidence of racially discriminatory intent. *Arlington Heights*, 429 U.S. at 266.

Defendants argue that the percentage of fines imposed on Vietnamese-owned salons should not be viewed in light of *all* the salons within the LSBC's regulatory mandate, but rather in light of manicuring salons *only*.[17]  Director Young, in his deposition testimony, estimated that 80% of all manicuring salons are owned by persons of Vietnamese heritage.[18]  Defendants argue that other types of salons are "dissimilar from nail salons under the law" because "nail salon[s] [are] subject to procedures and requirements that differ from those of . . . hairdressing salon[s] and . . . esthetics salon[s],"[19] and thus hair salons and esthetics salons are not "similarly situated" to nail salons and are not suitable comparators.[20]  Because of the high rate of manicuring-salon ownership by persons of Vietnamese heritage, Defendants' argument follows, the imposition of fines against such salons at a similarly high rate is not unusual, let alone indicative of the "stark" pattern noted by the Court in *Gomillion* and *Yick Wo*.[21]

---

[17] *See* Doc. 162-1 at pp. 9-10.

[18] Doc. 167-3 at p. 36, l. 1.

[19] Doc. 162-1 at p. 9.

[20] *Id*. at p. 10.

[21] *See id*. at p. 19.

Because the parties dispute whether the fines imposed by the LSBC against salons owned by persons of Vietnamese heritage should be viewed in light of *all* the salons within the LSBC's regulatory mandate or simply the manicuring salons that the LSBC regulates – and such a distinction is essential in determining whether there is a "clear pattern, unexplainable on grounds other than race" similar to the pattern in *Yick Wo*, *id.* – summary judgment is not proper. This question – whether the rate of fines imposed on salons owned by persons of Vietnamese heritage should be viewed in light of *all* salons or merely manicuring salons – is a "genuine issue for trial." *Anderson*, 477 U.S. at 250. That question should be submitted to a jury, and therefore Defendants are not entitled to summary judgment on Plaintiffs' race discrimination claims.

The Court also notes that, regardless of whether the rate of fines imposed on salons owned by persons of Vietnamese heritage should be viewed in light of all salons or merely manicuring salons, Plaintiffs have produced evidence that indicates that manicuring salons – as a category of salons – receive increased scrutiny when compared with other categories of salon. For example, Plaintiffs have produced a memorandum that was circulated to all LSBC inspectors, instructing the inspectors to issue violations to owners of manicuring salons – and *only* owners of manicuring salons – for the possession of waxing equipment, even though *possession* of such equipment is not violative of any regulations. Because of the high rate of manicuring-salon ownership by persons of Vietnamese heritage, a "genuine issue for trial" also exists regarding Defendants' potential utilization of a category of salons – manicuring salons – as a race-neutral "stalking horse" for increased scrutiny on and

15

discrimination against persons of Vietnamese heritage.  *Id.*  Therefore, summary judgment is not proper on Plaintiffs' race discrimination claims.

## B.    Claim Against Defendant Keller

Defendants assert that Keller should be dismissed as a Defendant in this matter because there are no claims currently pending by any Plaintiff that implicate her or her conduct.[22]  The Court previously dismissed Plaintiff Hoang's claim of false imprisonment against Keller. (*See* Doc. 63 at p. 10).  In the same Ruling and Order, the Court denied Keller's motion to dismiss with respect to any claims of racial discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.  (*See id.*).

Hoang is the only remaining Plaintiff to allege that Keller was present and acting as an inspector during the inspection of a salon.  (*See* Doc. 1-1 at ¶ 10).  The parties agree that Keller was present during the inspection of Hoang's salon that took place on or about May 3, 2013.[23]  Defendants argue that because Hoang's allegations center primarily on the conduct of Stockstill during a previous inspection – an inspection in which Keller did not participate – Hoang has no viable equal protection claim against Keller.[24]

---

[22] Plaintiffs did not brief an argument opposing this portion of Defendants' Motion for Summary Judgment, *see* Doc. 180, but did offer argument on this point during the hearing on the Motion.

[23] *Compare* Doc. 162 at ¶ 46 ("On or about May 3, 2013, inspector Sherrie Stockstill, this time, accompanied by inspector Margaret Keller, inspected Magic Nails."), *with* Doc. 167-2 at ¶ 46 (stating that there is "[n]o dispute" as to this fact).

[24] *See* Doc. 162-1 at p. 37.

Plaintiffs claim that they were "arbitrarily discriminated against or racially profiled based on their race, ethnicity or national origin by the Louisiana State Board of Cosmetology and/or its agents." (*Id.* at ¶ 5). As proof of the alleged discrimination, Plaintiffs principally point to evidence that indicates that persons of Vietnamese heritage disproportionately were fined by the LSBC, potentially in an exceptionally discriminatory fashion.[25]   As a result of the inspection that Stockstill and Keller conducted, the LSBC imposed fines on Hoang.[26]   Because Keller participated in the inspection and this inspection resulted in fines that could be construed as part of the overall discriminatory pattern that Plaintiffs allege is evinced by the proportion of fines imposed against persons of Vietnamese heritage, Hoang has a viable claim against Keller, and Keller properly remains a Defendant in this matter.  *See Woods v. Edwards*, 51 F.3d 577, 583 (5th Cir. 1995) ("In order to state a cause of action under section 1983, the plaintiff must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged.")

## C.    False Imprisonment

"False imprisonment is the 'unlawful and total restraint of the liberty of the person.'"  *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1136 (5th Cir. 2014) (quoting *Crossett v. Campbell*, 48 So. 141, 143 (La. 1908)).  To establish a claim for false

---

[25] *See supra* text accompanying notes 14-16.

[26] *See* Doc. 162-6 at pp. 123, 129, Consent Agreements, dated June 27, 2013.  Hoang agreed to pay a fine of $1,200 in each of the Consent Agreements, both of which related – in part – to the alleged violations that were uncovered during Stockstill and Keller's inspection on May 3, 2013.  *See id.*

imprisonment, a plaintiff must demonstrate that (1) she was detained and (2) her detention was unlawful. *Id.* The warrantless inspection of a "pervasively regulated business . . . will be deemed reasonable only so long as three criteria are met": (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary to further [the] regulatory scheme'"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *New York v. Burger*, 482 U.S. 691, 702 (1987) (quoting *Donovan v. Dewey*, 452 U.S. 594, 600, 602 (1981)).

For the statute's inspection program to "provid[e] a constitutionally adequate substitute for a warrant[,] the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Id.* at 703. "To perform this first function, the statute must be 'sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes.'" *Id.* (quoting *Donovan*, 452 U.S. at 600). "[I]n defining how a statute limits the discretion of the inspectors," the Supreme Court has "observed that it must be 'carefully limited in time, place, and scope.'" *Id.* (quoting *United States v. Biswell*, 406 U.S. 311, 315 (1972)).

Plaintiff T. Nguyen has alleged that during Stockstill's inspection of Exotic Nails on July 19, 2013, Stockstill prohibited T. Nguyen and her employees from leaving the salon for approximately two hours. (*Id.* at ¶ 8). Defendants *themselves*

18

refer to this act as a "two-hour[-]long detainment," thereby conceding that T. Nguyen and her employees indeed were detained.[27]   Defendants assert, however, that detaining employees of a manicuring salon within the confines of the business for a two-hour period during an administrative inspection is both permissible under the regulatory scheme and reasonable under the law.

The Court cannot reach the conclusion that the act of detaining the employees of a business for a two-hour period during a regulatory inspection is reasonable as a matter of law.  The statute that authorizes inspections of manicuring salons states, in whole, that "[t]he board shall be responsible for the control and regulation of the practice of cosmetology and shall . . . [i]nspect during hours of operation any licensed, permitted, certified, or registered facility or school, including but not limited to pertinent records, for the purpose of determining if any provisions of law governing the practice of cosmetology are being violated."  La. Rev. Stat. § 37:575(A)(10).  The regulation interpreting this statute states, in whole, that "[i]nspectors and employees of the board are entitled to enter any premises licensed by the board, to interview any person present at the facility and to examine all work records pertaining to the cosmetology profession during the regular business hours of the facility."  La. Admin. Code tit. 46, pt. XXXI, § 901.  Through this statute and regulation, owners of manicuring salons are made aware that their businesses may be subject to inspection by the LSBC at any time during regular business hours.  Owners of manicuring salons are *not* made aware, however, that they may be detained during those

_____

[27] Doc. 162-1 at p. 29.

inspections – possibly for a number of hours – nor are they made aware of the purpose of such a detainment. Further, the *only* time limitation that the statute and regulation appear to place on such a detainment is that the detainment may be effectuated only "during the regular business hours of the facility." *Id.* Such a "limitation" is far from being "carefully limited in time," as is required for the statute to "provid[e] a constitutionally adequate substitute for a warrant" and for the warrantless search of a business to be deemed reasonable. *Burger*, 482 U.S. at 702-03. Therefore, summary judgment is not proper on Plaintiff T. Nguyen's false imprisonment claim because Defendant Stockstill has not shown that that she is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### D. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Terry v. Hubert*, 609 F.3d 757, 761 (5th Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223 (2009)). Qualified immunity is a "defense that is only relevant to individual capacity claims." *Sanders-Burns v. City of Plano*, 594 F.3d 366, 371 (5th Cir. 2010). Regarding officials sued in their individual capacities, qualified immunity does not prevent an award of prospective injunctive relief. *See Mangaroo v. Nelson*, 864 F.2d 1202, 1208 (5th Cir. 1989); *accord Chrissy F. ex rel. Medley v. Miss. Dep't of Pub. Welfare*, 925 F.2d 844, 849 (5th Cir. 1991) ("Neither absolute nor qualified immunity extends to suits for injunctive or declaratory relief under § 1983.").

20

"The moving party is not required to put forth evidence to meet its summary judgment burden for a claim of immunity. It is sufficient that the movant in good faith pleads that it is entitled to . . . qualified immunity." *Beck v. Tex. State Bd. of Dental Exam'rs*, 204 F.3d 629, 633 (5th Cir. 2000). "Once the [movant] *asserts* this affirmative defense, the burden *shifts* to the plaintiff to rebut it." *Id.* at 633-34 (quoting *Whatley v. Philo*, 817 F.2d 19, 20 (5th Cir. 1987)) (alteration in original).

In deciding whether an official, sued in her individual capacity, is entitled to qualified immunity, the Court must determine "(1) whether the plaintiff has alleged a violation of a clearly established constitutional right[,] and (2) if so, whether the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident." *Jacobs v. W. Feliciana Sheriff's Dep't*, 228 F.3d 388, 393 (5th Cir. 2000).

Defendants assert that Stockstill and Keller, to the extent that Plaintiffs have sued the two Defendants in their individual capacities, are entitled to qualified immunity. First, the Court notes that in their First Amended Complaint, Plaintiffs only name Keller as a Defendant "in her official capacity," and thus qualified immunity is inapplicable to the claims asserted against Keller. (Doc. 44 at ¶ 2(n)). Second, in their Complaint and First Amended Complaint, Plaintiffs seek multiple forms of declaratory and injunctive relief. (*See* Docs. 1, 44). Because qualified immunity does not extend to suits for declaratory or injunctive relief, qualified immunity does not shield Stockstill from the claims of Plaintiffs insofar as they seek declaratory and injunctive relief.

21

1. *Qualified Immunity on Plaintiffs' Race Discrimination Claims*

The right to be free from invidious racial discrimination is clearly established. *See, e.g., Strauder v. West Virginia*, 100 U.S. 303 (1880). "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people, and therefore are contrary to our traditions and hence constitutionally suspect." *Fisher*, 133 S. Ct. at 2418. It is objectively unreasonable to apply and administer a facially neutral law or ordinance "exclusively against a particular class of persons." *Yick Wo*, 118 U.S. at 373. Such an application or administration of laws or ordinances "warrant[s] and require[s] the conclusion that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured to . . . all . . . persons . . . by the broad and benign provisions of the Fourteenth Amendment." *Id.* The objective unreasonableness of such an application of a law or ordinance has been clearly established since the Supreme Court's holding in *Yick Wo*.

In this case, Plaintiffs alleged that they were "harassed, intimidated, falsely imprisoned, and arbitrarily discriminated against or racially profiled based on their race, ethnicity or national origin by the Louisiana State Board of Cosmetology and/or its agents" in violation of the Fourteenth Amendment. (Doc. 1-1 at ¶ 5). Therefore, Plaintiffs have alleged a violation of the clearly established constitutional right to be free from invidious racial discrimination. *See Fisher*, 133 S. Ct. at 2418.

22

As discussed previously, Plaintiffs have produced evidence that indicates that persons of Vietnamese heritage disproportionately were fined by the LSBC, potentially in an exceptionally discriminatory fashion.[28]   Defendants dispute both the accuracy and the computation of the figures that underlie Plaintiffs' proffered evidence of the alleged discrimination.[29]   Defendants' conduct of imposing fines on owners of salons who are of Vietnamese heritage in such a discriminatory fashion, *if proven by a preponderance of the evidence*, would be objectively unreasonable. *See Yick Wo*, 118 U.S. at 373  (holding that the implementation of the ordinances in that case, "in actual operation[,] establish[ed] an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion that, whatever may have been the intent of the ordinances as adopted, they [were] applied by the public authorities charged with their administration, and thus representing the state itself, with a mind so unequal and oppressive as to amount to a practical denial by the state of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the Fourteenth Amendment").

The determination of whether Stockstill is entitled to qualified immunity on the claims asserted against her in her *individual* capacity, insofar as Plaintiffs seek monetary damages on those claims,[30] thus rests on an issue of fact that only may be

---

[28] *See supra* text accompanying notes 14-16.

[29] *See supra* text accompanying notes 17-21.

[30] Although each of the Plaintiffs have included monetary damages as a portion of the relief sought in the Pretrial Order, *see* Doc. 181 at pp. 5-6, the issue of whether Plaintiffs have viable claims for

23

determined after evidence is produced at trial.  Therefore, the Court's determination of whether Defendant Stockstill is entitled to qualified immunity on the claims asserted against her in her *individual* capacity, insofar as Plaintiffs seek monetary damages on those claims, is deferred.

### 2. Stockstill's Qualified Immunity on T. Nguyen's False Imprisonment Claim

The "right of the people to be secure in their persons" was established by the Fourth Amendment itself.  U.S. Const. amend. IV.  Additionally, "[t]he Supreme Court long ago recognized that the Fourth Amendment protects the owner of a commercial establishment, even a heavily regulated one, 'from *unreasonable* intrusions onto his property by agents of the government.'"  *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 202-03 (5th Cir. 2009) (quoting *Donovan*, 452 U.S. at 599).  Plaintiff T. Nguyen has alleged that she was detained by a government agent – Stockstill – without a warrant and for approximately two hours, which is a "violation of a clearly established constitutional right."  *Jacobs*, 228 F.3d at 393.  Clearly established law at the time of the detainment in this case protected business owners "from *unreasonable* intrusions onto [their] property by agents of the government," *Donovan*, 452 U.S. at 599, and thus the determination of whether Stockstill is entitled to qualified immunity on T. Nguyen's false imprisonment claim hinges on the objective reasonableness of Stockstill's conduct, *Jacobs*, 228 F.3d at 393.

---

monetary damages is an unsettled question and the subject of Defendants' pending Motion in Limine, *see* Doc. 184 at ¶ 1.

The Court finds that Stockstill's conduct of detaining T. Nguyen and her employees for a two-hour period while Stockstill conducted an inspection of Exotic Nails was objectively unreasonable.  No reasonable inspector in Stockstill's position could believe that a regulation permitting her to inspect business records and interview employees of a manicuring salon would justify or permit the detainment of all the employees of the salon for a two-hour period.  No reasonable officer could have concluded that detaining manicuring-salon workers for two hours was a permissible aspect of a lawful, warrantless administrative search conducted for the sole purpose of uncovering potential regulatory violations of the Louisiana Cosmetology Act; such a detainment resembles an aspect of a criminal investigation.  *See Club Retro*, 568 F.3d at 203.  Once an inspector has verified the licensure of each employee to perform manicuring services, it is objectively unreasonable to restrict that employee's movement and to detain that person, let alone detain that person for *two hours*.  Therefore, Stockstill is not entitled to qualified imminuty on T. Nguyen's claim of false imprisonment.

### E.    Eleventh Amendment Immunity

The Court has previously ruled that the LSBC is not entitled to Eleventh Amendment immunity.  (*See* Doc. 63 at pp. 16-17).  To the extent that Defendants urge the same arguments in favor of a finding of Eleventh Amendment immunity in *this* Motion, those arguments remain unavailing.

### F.      Vicarious Liability of the LSBC

####       1.      *Official Policy or Custom of the LSBC*

Municipalities may not be held liable under 42 U.S.C. § 1983 on the theory of respondeat superior. *Valle v. City of Hous.*, 613 F.3d 536, 541 (5th Cir. 2010). "A municipality is liable only for acts directly attributable to it 'through some official action or imprimatur.'" *Id.* (quoting *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001)). "To establish municipal liability under § 1983 . . . [a] plaintiff must identify '(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose moving force is that policy or custom.'" *Id.* at 541-42 (quoting *Pineda v. City of Hous.*, 291 F.3d 325, 328 (5th Cir. 2002) (internal quotation marks omitted)). In reference to the first prong, the existence of an "official policy" may be demonstrated by evidence of a "persistent, widespread practice of . . . officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents [official] policy." *Burge v. St. Tammany Par.*, 336 F.3d 363, 369 (5th Cir. 2003) (quoting *Bennett v. City of Slidell*, 735 F.2d 861, 862 (5th Cir. 1984) (per curiam)). Regarding the second prong, "[a]ctual or constructive knowledge of [a] custom must be attributable to the governing body of the municipality." *Webster v. City of Hous.*, 735 F.2d 838, 842 (5th Cir. 1984) (en banc). "Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation will most likely occur." *Burge*, 336 F.3d at 370.

26

The Court has previously determined that the LSBC is "not an arm of the state," primarily due to the fact that the LSBC receives no state funding and is designated as a professional association. (*See id.*). Because of the unusual character of the LSBC insofar as it was not formed as a traditional state board, agency, or commission, it is not clear whether the standards applicable to holding a municipality liable for an official policy of its subordinate agencies are applicable in this case. Even if those standards *are* applicable, however, Plaintiffs have demonstrated a custom that, if proven by a preponderance of the evidence, is facially unconstitutional, and thus Plaintiffs potentially could establish municipal liability.

Plaintiffs have produced facts that, if proven by a preponderance of the evidence, would demonstrate "[a] persistent, widespread practice of . . . officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents [official] policy." *Id.* at 369 (quoting *Bennett*, 735 F.2d at 862). As discussed above, Plaintiffs have produced evidence that indicates that persons of Vietnamese heritage disproportionately were fined by the LSBC, potentially in an exceptionally discriminatory fashion.[31] If the figures that underlie Plaintiffs' proffered evidence of the alleged discrimination are proven by a preponderance of the evidence, the imposition of fines in such a distinct pattern against a particular class of individuals can be treated as an "official policy" of the LSBC. *See id.* As stated previously, if these figures are proven by a preponderance of the evidence, Plaintiffs will have

---

[31] *See supra* text accompanying notes 14-16.

27

produced evidence of facially unconstitutional racial discrimination, *see Arlington Heights*, 429 U.S. at 266, and Plaintiffs thus will have demonstrated that the LSBC had knowledge of the custom and that a constitutional violation resulted from that custom, *Burge*, 336 F.3d at 370 ("Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation will most likely occur."). Therefore, Plaintiffs could hold the LSBC liable for the alleged constitutional violations in this matter even if they were required to satisfy the test to hold a municipality liable under 42 U.S.C. § 1983.

### 2.    *Failure to Train or Supervise*

To hold a municipality liable for an alleged constitutional violation under 42 U.S.C. § 1983 that resulted from deficient training or supervision, a plaintiff must establish that "1) the [supervising authority] failed to train or supervise the offic[ials] involved[,] 2) there is a causal connection between the alleged failure to supervise or train and the alleged violation of the plaintiff's rights[,] and 3) the failure to train or supervise constituted deliberate indifference to the plaintiff's constitutional rights." *Thompson v. Upshur Cty.*, 245 F.3d 447, 459 (5th Cir. 2001). The third prong of this test, which requires that the failure to train or supervise constitute "deliberate indifference to the plaintiff's constitutional rights," *id.*, is analytically identical to the requirement that a plaintiff – when asserting municipal liability on the basis of an official policy or custom – demonstrate a municipality's actual or constructive knowledge of an official policy or custom and a resulting constitutional violation. *See Burge*, 336 F.3d at 370 (holding that "[t]he knowledge requirement applies with equal

28

force where a section 1983 claim is premised on a failure to train or to act affirmatively" and that "both theories . . . require[] proof of deliberate indifference").

Similar to the analysis above, it is not clear whether the standards applicable to holding a municipality liable for a failure to train or supervise are applicable in this case.  Even if those standards *are* applicable, however, Plaintiffs have produced enough facts to demonstrate a "genuine issue for trial."

The figures demonstrating the LSBC's imposition of fines in such a distinct pattern against a particular class of individuals, if proven at trial, could indicate the LSBC's "deliberate indifference to the plaintiff's constitutional rights." *Thompson*, 245 F.3d at 459; *see also Burge*, 336 F.3d at 370 ("Where an official policy or practice is unconstitutional on its face, it necessarily follows that a policymaker was not only aware of the specific policy, but was also aware that a constitutional violation will most likely occur.").

Regarding the issue of whether the LSBC failed to train or supervise its inspectors and whether that failure was the cause of the alleged constitutional violation in this matter, a "genuine issue for trial" exists. *Anderson*, 477 U.S. at 250. Defendants assert that "[c]osmetology inspectors receive on[-]the[-]job training, which may last up to one year, from other experienced cosmetology inspectors and further receive periodic, continuing education from [persons associated with the LSBC]."[32]  Plaintiffs direct the Court to deposition testimony that indicates that

---

[32] Doc. 162-2 at ¶ 15.

LSBC inspectors "don't really receive training,"[33] that inspectors "train [them]selves as [they] work through the rules and regulations,"[34] or that the training lasts for a period of mere weeks.[35]  There thus exists a "genuine issue for trial" regarding whether the LSBC inspectors receive training – and if they do, the quality of that training – and whether the alleged failure to train caused the alleged constitutional violation in this case.  *Id.*  The LSBC therefore is not entitled to summary judgment on these grounds.

### 3.    *Cangelosi's Status as an Independent Contractor*

Under Louisiana law, a principal is generally not liable for the conduct of an independent contractor unless "the principal retains operational control over the contractor's acts or expressly or impliedly authorizes those acts."  *Coulter v. Texaco, Inc.*, 117 F.3d 909, 911-12.  "Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way."  *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003).  In order for the Court to find that a principal retained operational control, "[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."  *Landry v. Huthnance Drilling Co.*, 889 F.2d 1469, 1471 (5th Cir. 1989).  Under Louisiana law, "the relationship between the principal and the independent

---

[33] Doc. 167-4 at p. 38.

[34] *Id.*

[35] *See* Doc. 167-9 at p. 32.

30

contractor is in large measure determined by the terms of the contract itself." *Ham v. Pennzoil Co.*, 869 F.2d 840, 842 (5th Cir. 1989).

In her contract with the LSBC, Cangelosi agreed to furnish "[a]ll legal services required by the [LSBC], including but not limited to advisory opinions, legal research[,] and appearances in court on behalf or in defense of the Board serving as complaint counsel or counsel to the Board in disciplinary hearings as required and requested by the Chairman or designee."[36]  The contract further states that "[t]hese legal services are to be provided under the immediate supervision of the staff of the State and subject to secondary review by the Department of Justice, Office of the Attorney General."[37]  Cangelosi, in rendering the contracted-for legal services, was under the direct supervision of the staff of the State of Louisiana, and any legal services she rendered pursuant to the contract were subject to review – and presumably alteration – by the Office of the Attorney General.  Depending on the nature and extent of this supervision and review, the contractual arrangement between Cangelosi and the LSBC may not be fairly characterized as one of an "independent contractor" because this supervision and review may amount to "operational control."  *See Landry*, 889 F.2d at 1471 ("There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.").  Therefore, a "genuine issue for trial" exists regarding the operational control that the LSBC retained over Cangelosi in her furnishing of legal services and,

---

[36] Doc. 149-12 at ¶ 1; *accord* Doc. 149-13 at ¶ 1.

[37] Doc. 149-12 at ¶1; *accord* Doc. 149-13 at ¶ 1.

consequently, regarding Cangelosi's status as an independent contractor. *Anderson*, 477 U.S. at 250. Thus, the LSBC is not entitled to summary judgment on the grounds that it is not liable for the conduct of Cangelosi.

## IV.    CONCLUSION

Based on the foregoing,

**IT IS ORDERED** that Defendants' **Motion for Summary Judgment (Doc. 162)** is **DENIED**.

Baton Rouge, Louisiana, this 20th day of February, 2017.

BRIAN A. JACKSON, CHIEF JUDGE
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA